**RECORD NO. 24-7009**

---

**IN THE UNITED STATES COURT OF APPEAL**
**FOR THE FOURTH CIRCUIT**

---

BEATRICE V. JOHNSON, individually and as personal
representative of the Estate of Paul Antione Johnson

*Plaintiff-Appellant*

v.

TANYA ADAMS; JOYCE RICE; JANET WHITE;
HENRY WILLIAMS, LPN

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

---

**APPELLANT'S BRIEF**

---

Jordan C. Calloway
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800
jcalloway@mcgowanhood.com

Whitney B. Harrison
McGowan, Hood, Felder & Phillips, LLC
1517 Hampton Street
Columbia, SC 29201
(803) 779-0100
wharrison@mcgowanhood.com
*Attorneys for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-7009_      Caption: _Beatrice Johnson v. Tanya Adams et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Beatrice Johnson_
(name of party/amicus)

_Individually and as PR for the Estate of Paul Antoine Johnson_

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES☐NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jordan C. Calloway                    Date:          11/5/24

Counsel for: Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES……………………………………………..iv

JURISDICTIONAL STATEMENT ………………………………………1

STATEMENT OF ISSUES ON APPEAL ……………………..................2

STATEMENT OF THE CASE ……………………………………………2

STATEMENT OF THE FACTS……………………………………………..4

    A. Johnson was booked into Colleton County Detention Center
       with a number of physical and mental health conditions..................4

    B. Johnson's physical condition deteriorated for all to see over the
       following five days...............................................................................8

    C. By the morning of July 17, 2019, Johnson had effectively stopped
       eating, moving, communicating, and thinking clearly......................9

    D. Johnson's unmanaged diabetes caused his organs to shut down.........11

ARGUMENT SUMMARY ……………………………………………..13

STANDARD OF REVIEW ……………………………………………..16

ARGUMENT

    1. Williams's and CCDC Employees' misconduct must be evaluated
       for "objective unreasonableness," not subjective recklessness............19

    2. Johnson's diabetes-related decline posed a substantial risk of
       serious harm prior to the afternoon of July 17, 2019..........................23

    3. Williams's egregious mismanagement of Johnson's diabetes is a
       classic example of deliberate indifference...........................................29

a. Williams defied the physician's order requiring blood sugar tests for Johnson three times per day........................................................30

b. Williams was indifferent to Johnson's dangerously high blood sugar test on July 17, 2019...............................................................36

4. CCDC Employees failed to inform medical personnel of crucial information and failed to seek medical care when Johnson was in their charge.....................................................................42

5. In light of Williams's and CCDC Employees' deliberate indifferent conduct, the district court erred in awarding summary judgment on their qualified immunity defense......................................48

CONCLUSION…………………………………………………………….....55

REQUEST FOR ORAL ARGUMENT.............................................................55

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)................................................................29, 51

Beatty v. Davidson,
    713 F. Supp. 2d 167 (W.D.N.Y. 2010)................................24

Bell v. Wolfish,
    441 U.S. 520 (1979)...........................................................19

Bivens v. Six Unknown Named Agents of Federal Bureau of
Narcotics,
    403 U.S. 388 (1971)...........................................................53

Bolling v. Carter,
    819 F.3d 1035 (7th Cir. 2016)............................................32

Booker v. South Carolina Department of Corrections,
    855 F.3d 533 (4th Cir. 2017)..............................................52

Boretti v. Wiscomb,
    930 F.2d 1150 (6th Cir. 1991)............................................32

Brown v. Hughes,
    894 F.2d 1533 (11th Cir. 1990)..........................................41

Brown v. Plata,
    563 U.S. 493 (2011)...........................................................16

Campbell v. Beto,
    460 F.2d 765 (5th Cir. 1972)..............................................30

Charbonnages de France v. Smith,
    597 F.2d 406 (4th Cir. 1979)..............................................16

Clement v. Gomez,
    298 F.3d 898 (9th Cir. 2002)..............................................24

County of Sacramento v. Lewis,
    523 U.S. 833 (1998)..............................................................20

Crowson v. Washington County, Utah,
    983 F.3d 1166 (10th Cir. 2020)............................................43

Darrah v. Krisher,
    865 F.3d 361 (6th Cir. 2017)...........................................40, 43

De'Lonta v. Angelone,
    330 F.3d 630 (4th Cir. 2003)...........................................19, 36

Doe v. South Carolina Department of Social Services,
    597 F.3d 163 (4th Cir. 2010)...............................................49

Edwards v. Duncan,
    355 F.2d 993 (4th Cir. 1966)...............................................30

Estelle v. Gamble,
    429 U.S. 97 (1976)......................................................passim

Farmer v. Brennan,
    511 U.S. 825 (1994)...............................14, 16, 19-21, 54

Ford v. Anderson County, Texas,
    102 F.4th 292 (5th Cir. 2024)..............................................25

Gil v. Reed,
    381 F.3d 649 (7th Cir. 2004)...............................................32

Gilmore v. Hodges,
    738 F.3d 266 (11th Cir. 2013)..............................................31

Gomez v. Atkins,
    296 F.2d 253 (4th Cir. 2002)...........................................49, 50

Gordon v. Schilling,
    937 F.3d 348 (4th Cir. 2019)...............................................25

Harlow v. Fitzgerald,
    457 U.S. 800 (1982)..........................................................49

Henderson v. Sheahan,
    196 F.3d 839 (7th Cir. 1999)...........................................24

Hixson v. Moran,
    1 F.4th 297 (4th Cir. 2021)..............................................36

Hope v. Pelzer,
    536 U.S. 730 (2002)..........................................50, 51, 54

Iko v. Shreve,
    535 F.3d 225 (4th Cir. 2008).........................20, 24, 43, 54

Ingraham v. Wright,
    430 U.S. 651 (1977)..........................................................21

Jackson v. Lightsey,
    775 F.3d 170 (4th Cir. 2018)...........................................37

Jennings v. University of North Carolina,
    482 F. 3d 686 (4th Cir. 2007)..........................................16

Kingsley v. Hendrickson,
    576 U.S. 389 (2015)......................................19, 21, 22

Kovari v. Brevard Extraditions, LLC,
    461 F. Supp. 3d 353 (W.D. Va. 2020)............................24

Lewis v. Wallenstein,
    769 F.2d 1173 (7th Cir. 1985).........................................41

Lolli v. County of Orange,
    351 F.3d 410 (9th Cir. 2003)...........................................24

McRaven v. Sanders,
    577 F.3d 974 (8th Cir. 2009)...........................................44

Montgomery v. Pinchak,
    294 F.3d 492 (3d Cir. 2002)....................................................32

Oglesby v. Stevenson,
    Civil Action No. 8:13-3378-TMC-JDA,
    2014 WL 7409592 (D.S.C. Dec. 31, 2014)...........................31, 43

Owens ex rel. Owens v. Lott,
    372 F.3d 267 (4th Cir. 2004)....................................................52

Parrish ex rel. Lee v. Cleveland,
    372 F.3d 294 (4th Cir. 2004)....................................................21

Paugh v. Uintah County,
    47 F.4th 1139 (10th Cir. 2022)................................................44

Perini Corp. v. Perini Construction Co.,
    915 F.2d 121 (4th Cir. 1990)....................................................29

Pfaller v. Amonette,
    55 F.4th 436 (4th Cir. 2022).......................................16, 31, 32, 35

Pierce v. Ford Motor Co.,
    190 F. 2d 910 (4th Cir. 1951)...................................................16

Rainey v. Conerly,
    973 F.2d 321 (4th Cir. 1992)....................................................49

Reece v. Hale,
    58 F.4th 1027 (8th Cir. 2023)...................................................44

Rhodes v. Chapman,
    452 U.S. 337 (1981)...............................................................19

Roberson v. Bradshaw,
    198 F.3d 645 (8th Cir. 1999)....................................................25

Rodriguez v. Jabe,
    904 F.2d 708, 1990 WL 82722 (6th Cir. June 19, 1990).........31

Saucier v. Katz,
    533 U.S. 194 (2001)...........................................................................50

Scarberry v. Bowman,
    16 F.3d 411 (Table), 1993 WL 539498 (4th Cir. Dec. 30, 1993)......31, 43

Scinto v. Stansberry,
    841 F.3d 219 (4th Cir. 2016)............................................................passim

Short v. Hartman,
    87 F.4th 593 (4th Cir. 2023)............................................................22, 37

Sims v. Labowitz,
    885 F.3d 254 (4th Cir. 2018)................................................................51

Smith v. Lisenbe,
    73 F.4th 596 (8th Cir. 2023).................................................................43

Smith v. Smith,
    589 F.3d 736 (4th Cir. 2009).................................................31, 32, 35, 40

Strickler v. Waters,
    989 F.2d 1375 (4th Cir. 1993)..............................................................20

Tarashuk v. Givens,
    53 4th 154 (4th Cir. 2022)...................................................................54

Terrance v. Northville Regional Psychiatric Hospital,
    286 F.3d 834 (6th Cir. 2002)...............................................................41

Tolan v. Cotton,
    572 U.S. 650, (2014)..........................................................................49

Tolbert v. Eyman,
    434 F.2d 625 (9th Cir. 1970)...............................................................30

Wilbron v. Hutto,
    509 F.2d 621 (8th Cir. 1975)...............................................................30

Williams v. Strickland,
 917 F.3d 763 (4th Cir. 2019).................................................52

Wilson v. Kittoe,
 337 F.3d 392 (4th Cir. 2003)...............................................52

Wilson v. Seiter,
 501 U.S. 294 (1991)..............................................................19

## **CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. VIII…………………………………………......passim

U.S. Const., amend. XIV…………………………………………......passim

## **STATUTES AND COURT RULES**

28 U.S.C. § 1291.....................................................................................1

28 U.S.C. § 1331…………………………………………………...........1

42 U.S.C. § 1983…………………………………………………......passim

## **SECONDARY SOURCE**

Diabetes in America" 5 (Maureen I. Harris et al. eds. 2d ed. 1995).................24

# JURISDICTIONAL STATEMENT

Any citizen deprived of a federal constitutional right by a person acting under color of state law may seek legal and equitable remedies for losses caused by the deprivation. 42 U.S.C. § 1983. Among other claims, Appellant Beatrice Johnson's complaint alleged Appellees Tanya Adams, Joyce Rice, Janet White (collectively, "the CCDC Employees"), and Henry Williams, LPN violated her son Paul Johnson's Fourteenth Amendment due process rights by showing deliberate indifference to Johnson's serious medical needs. (JA27-34). The district court had jurisdiction over Ms. Johnson's section 1983 claim, a claim arising under federal law. 28 U.S.C. § 1331.

On September 26, 2024, the district court granted Williams and the CCDC Employees' motions for summary judgment. Ms. Johnson filed a Notice of Appeal on October 21, 2024. See Fed. R. App. P. 4(a)(1)(A). The order was a "final decision[] of the district court[]," and this Court has jurisdiction over Ms. Johnson's appeal. 28 U.S.C. § 1291.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court erred in concluding a pretrial detainee's physical and mental decline caused by unmonitored diabetes only became a serious medical need when it reached the point where the inmate's organs began shutting down.

2. Whether a reasonable jury could find a jail nurse acted with deliberate indifference by repeatedly ignoring a physician's order to test a diabetic inmate's blood sugar and by later discounting the inmate's dangerously high blood sugar reading.

3. Whether a reasonable jury could find correctional officers acted with deliberate indifference by failing to inform the jail nurse of important information regarding a sick inmate's nutritional and breathing issues when officers knew of said information.

4. Whether this Court's ruling in <u>Scinto</u> on deliberately indifferent diabetes care, as well as substantial Supreme Court precedent, provided a jail nurse and corrections officers the required fair notice that their interference and indifference violated an inmate's Fourteenth Amendment due process rights.

## STATEMENT OF THE CASE

Ms. Johnson initiated this civil rights suit on behalf of herself and the estate of her son Paul Antione Johnson by filing a Complaint in the United States District

Court for the District of South Carolina. (JA9-35). Ms. Johnson alleged Johnson received constitutionally inadequate medical care as a pretrial detainee at the Colleton County Detention Center ("CCDC") in July 2019. (JA12-20). Ms. Johnson's suit named as defendants CCDC Employees as well as Williams, a medical provider employed by Southern Health Partners ("SHP"), the contractor CCDC retained to provide medical services to its inmates. (JA10-11).

Ms. Johnson proceeded under 42 U.S.C. § 1983, alleging Williams and the CCDC Employees' acts and omissions violated Johnson's rights protected by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (JA20-34). Williams and the CCDC Defendants filed individual answers denying Ms. Johnson's claims and asserting various affirmative defenses. (JA36-74). Following discovery, Williams filed a motion for summary judgment (JA75), and the CCDC Defendants filed a collective motion for summary judgment the same day. (JA204-227). After briefing by all parties, US. Magistrate Judge Kaymani D. West issued a Report and Recommendation recommending the district court grant both motions. (JA995-1024).

Ms. Johnson filed timely objections. (JA796-809). In her Order and Opinion, U.S. District Judge Bruce Howe Hendricks overruled each of Ms. Johnson's objections while also adopting and incorporating Magistrate Judge West's Report. (JA1062-1073). The district court granted summary judgment to Williams and the

CCDC Employees on September 27, 2024. (JA1074). Ms. Johnson filed a timely notice of appeal on October 21, 2024. (JA1075) limited to Ms. Johnson's third and fourth causes of action regarding alleged violation of Johnson's due process rights.

## STATEMENT OF THE FACTS

Ms. Johnson's section 1983 suit faults the medical provider and correctional officers at the county jail where her 31-year-old son Paul Johnson's chronic medical conditions were so poorly monitored and treated that, in less than one week, he had to be rushed away in an ambulance with ultimately fatal multisystem organ failure.

**A. Johnson was booked into Colleton County Detention Center ("CCDC") with a number of physical and mental health conditions.**

Johnson was booked into CCDC just before 3 p.m. on July 11, 2019. (JA489; JA111). The booking officer, Appellee Janet White, had been on the job for only one month and was supervised by Appellee Joyce Rice, a CCDC shift sergeant. (JA601-602, JA650). White completed a computerized "Inmate Medical Screening Form" noting Johnson suffered from high blood pressure and diabetes for which he was under a doctor's care. (JA229). Johnson dutifully listed the medications needed to treat his chronic medical conditions and reported a history of suicidal thoughts. (JA299). When the form was completed, Johnson was asked to sign above a statement from CCDC assuring Johnson "HEALTH SERVICES are available to me while in custody." (JA231).

White's supervisor and CCDC lieutenant, Appellee Tanya Adams[1], recognized Johnson's intake showed a complicated medical situation that should lead to an immediate consultation with a medical provider. (JA494-495). By way of background, CCDC provides inmate medical services through contractor Southern Health Partners ("SHP"), mostly through licensed practical nurses ("LPN") like Appellee Henry Williams under the direction of a physician (Dr. Clarence Wimberly) who visits CCDC just once per week. (JA767, JA782).

After White completed intake, Johnson met with Alicia Price, a SHP LPN and the company's "medical team administrator." Price interviewed Johnson and completed a SHP-branded "Admission Data/History and Physical Form." (JA310). The form documented medical diagnoses of type-2 diabetes, high blood pressure, hyperlipidemia, anxiety, depression, and obsessive compulsive disorder. (JA310). Price also noted Johnson's recent suicidal thoughts. (JA310).

Johnson's thoughts of self-harm placed him on "suicide watch," which meant he was housed in a group of cells in the booking area and was supposed to be checked every fifteen minutes. White was one of the primary officers responsible for conducting these checks (JA674-675), noting them on a SHP "Suicide Watch Record," (SHP-000018-21) and documenting hourly observations on Johnson's

---

[1] Adams, Rice, and White are collectively referred to below as "the CCDC Employees."

CCDC "Inmate Monitoring Sheet." (JA280-284). Sgt. Rice was also responsible for some of the checks (JA382) with Lt. Adams often looking over the logs documenting Johnson's condition as observed during the checks. (JA466, JA486). Along with physical activity and general well-being, the officers were also supposed to document if a suicide watch inmate was not eating. (JA484). The CCDC Employees failed to properly document Johnson's food intake. (JA562).

Before being detained, Johnson's diabetes was closely monitored by home blood glucose tests and by his physicians. Johnson was under the care of Medical University of South Carolina ("MUSC") endocrinologist and diabetes specialist Dr. Nicoleta Sora. (Johnson 1080). A report from an April 2019 visit shows Dr. Sora saw Johnson for "uncontrolled treatment" of his diabetes. (JA166); (JA170) (noting Johnson's diabetes "is not controlled"). Dr. Sora's treatment plan called for multiple daily tests of Johnson's blood glucose levels. (JA165) ("test blood sugar twice daily"). The aim was to keep Johnson's blood sugar from straying too far from his baseline levels which had been established over time and were documented in a chart in his medical records:

> Fasting blood sugars:      90-120
>
> Pre-lunch blood sugars:   67-170
>
> Pre-dinner blood sugars:  200, 170s

(JA167). Dr. Sora was also especially concerned with Johnson's food intake. For Johnson to maintain healthy blood sugar levels, it was essential he "eat 3 meals per day" and "not skip meals." (JA170). That was paramount since Johnson was taking Glipizide, a diabetes medication also administered to him at CCDC. (JA170; JA128). According to Dr. Sora, Johnson absolutely "should not be skipping meals on Glipizide." (JA170).

The "Admission Data/History and Physical Form" Price completed for Johnson on July 11, 2019, both acknowledged Johnson's diabetes and included a partial plan for managing it. On the form's second page, a handwritten note reads: "BS x 3 times a day." (JA311). The note's meaning is undisputed—Johnson's blood sugar should be checked three times daily. (JA873). The form was signed by Price, Williams's direct supervisor. (JA311). Crucially, the page containing this note was also signed by a physician. (JA311). An order for multiple daily blood sugar tests should have come as no surprise to Williams or the CCDC Employees. That was standard procedure for all CCDC diabetic inmates. (JA545) ("if anybody come[s] in as a diabetic, then blood sugar is "to be checked before their meals in the mornings, evenings, and the afternoon"). It was also what the standard of care required for diabetes management (JA718) and was the baseline level of care Johnson received before he was detained. (JA165). Yet, from the beginning, this instruction went

unfollowed. Johnson's blood sugar was never checked on July 11th even though Williams admits it should have been. (JA877, JA886).

**B. Johnson's physical condition deteriorated for all to see over the following five days.**

Johnson's appearance and general level of well-being sharply declined from July 11-16th. According to White, Johnson "changed from the first day I saw him." Over time, he developed a "different look." (JA682-83). The 15-minute and hourly logs showed Johnson hardly spoke and rarely rose from his bed. (JA390). Then, sometime around July 15th, Adams says Johnson "just stopped eating." (JA390; JA561-62). White also remembers Johnson refusing meals, but she did not document it during her 15-minute checks. (JA682-83). White now admits Johnson's lack of appetite was concerning. (JA682) ("That got my attention.").

Williams was often the only medical professional at CCDC. Williams says he interacted with Johnson at least twice on most days (JA888), but Williams also had a history of incorrectly documenting observations of suicide watch patients. (JA819-820). Williams further admits he never once checked Johnson's blood sugar from July 11-16th. (JA887) ("it doesn't appear that he was checked three times a day, no"). This was despite the fact SHP designated hypertension and diabetes as "chronic care conditions to be monitored." (JA841). SHP also had an established protocol to address inmates with high blood sugar. Any inmate with a reading of over 126 mg/dL during a fasting blood sugar (i.e. sample collected when inmate had

no caloric intake for at least the previous 8 hours) was considered to have high blood sugar. (JA850). SHP even provided a "blood sugar check book" for Williams to record the three-times-per-day blood sugar checks required by physician order, SHP policy, and CCDC standard practice. (JA884). Yet, as Johnson—a man with uncontrolled diabetes who had stopped eating—continued to physically deteriorate in his cell, Williams continued not checking his blood sugar.

### C. By the morning of July 17, 2019, Johnson had largely stopped eating, moving, communicating, and thinking clearly.

Adams arrived at CCDC on July 17, 2019, to a disturbing report from Rice. Johnson was now "breathing different," an issue that began during the July 16-17th night shift. (JA520). When Adams arrived at Johnson's cell around 8 a.m., she confirmed he was both breathing heavily and wheezing. (JA519-520). The situation was obviously serious and warranted medical attention. (JA521) ("I knew something was going on"). Around this time, Williams finally conducted the first (*but only*) check of Johnson's blood sugar while he was a CCDC inmate. (JA908). Johnson's blood sugar level was 245 mg/dL, a value nearly twice that considered "high" under SHP policy. (JA850). That number was also 45 mg/dL more than the highest of Johnson's pre-incarceration baseline range and more than double the high end of Johnson's fasting blood sugar range (90-120). (JA167). This astounding result represented an emergency situation, especially for an inmate who had stopped eating

days earlier. (JA719) Johnson needed to be seen by a physician or transferred to a hospital immediately. (JA719).

Also, in the 8 a.m. time frame, Williams accompanied Johnson to the CCDC medical office for a scheduled evaluation with a remote mental health professional. The planned evaluation was unsuccessful because Johnson was unable to respond to the evaluator's inquiries. (JA316). He could not answer basic questions about where he was. Along with Johnson's disorientation, the mental health evaluator also noted Johnson's breathing "appeared labored." (JA316). Yet, Williams called Dr. Wimberly, reporting what is referred to as "normal" vital signs. (JA879). Williams says Dr. Wimberly ordered Johnson to remain on suicide watch and ordered Williams to monitor Johnson for any change in his condition. (JA906-907).

Even after a visit from Williams, Johnson was still breathing heavily throughout the morning. During a later check, Adams noticed Johnson's breathing remained heavy and recommended to Williams that Johnson receive a breathing treatment. (JA524-526). When other CCDC detention officers arrived at Johnson's cell to escort him to the medical office for the treatment, Johnson was unable to walk on his own. (JA527). Johnson's condition had now so far deteriorated that he could not take the 20-25 steps to walk 10-20 feet from his cell in booking to the medical office. (JA410; JA823). At that point, Adams admits this could have been a "more emergency situation." (JA527-528). While Williams saw Johnson again at 11:12

a.m. and 12 p.m. (JA911-912) he took no substantive action to check his blood sugar or to address his increasingly desperate situation.

### D. Johnson's unmanaged diabetes caused his organs to shut down.

Williams's "Progress Notes" for Johnson on July 17, 2019, are little more than a single page and document no interactions with Johnson from 12:00 p.m. to 3:50 p.m. (JA243). While Williams had gone by Johnson's cell multiple times throughout the morning, he stayed away that afternoon. This was despite Johnson's 245 mg/dL blood sugar reading, labored breathing, disorientation, lack of appetite, and inability to walk short distances that morning. This was also despite the fact that Dr. Wimberly specifically ordered continued suicide watch and for Williams to monitor Johnson for changes in his condition. (JA906-907). As had become the norm, Johnson also refused to eat that day's lunch. (JA913).

Williams has no personal knowledge of Johnson's status that afternoon. (JA921). However, during that time, Johnson's serious medical condition began to reach its end stage. Williams received a call around 3:50 p.m. and found Johnson slumped over on his side with black grainy vomit on himself, his bunk, and the floor. Williams maneuvered Johnson to a sitting position only for Johnson to vomit twice more. Black, grainy vomit is a sign of critical illness—either internal bleeding or organ failure. (JA927). EMS arrived within minutes and transferred Johnson to Colleton Medical Center. Johnson was later transferred to MUSC.

However, Johnson's condition was beyond saving, and he passed away on July 19, 2019. An autopsy concluded Johnson suffered multi-system organ failure and acute bronchopneumonia due to diabetic ketoacidosis ("DKA"). (JA20). After reviewing the CCDC file and Johnson's medical records, Ms. Johnson's expert concluded (1) the multiple daily blood sugar checks Williams was required to perform would have shown Johnson had persistently high blood sugars; and (2) DKA would have been timely identified as the likely cause of Johnson's decline had his blood sugar been properly monitored. (JA719-720).

# ARGUMENT SUMMARY

Ms. Johnson's son needlessly died from a diabetes complication after one week in CCDC Employees' custody and Williams's care. In the resulting section 1983 suit alleging violations of Johnson's due process rights, the district court incorrectly applied both components of the traditional "deliberate indifference" analysis. First, the district court erred by finding Johnson's condition was not objectively "serious" until the very moment he was discovered vomiting black grit in his cell. (JA1011-12). However, the record shows Johnson had long since stopped eating, moving, communicating, breathing, and thinking normally. Moreover, precedent establishes diabetes is a serious medical condition even before it devolves to a medical emergency.

Second, the district court erred in concluding as a matter of law that Williams was not deliberately indifferent to Johnson's medical needs. Williams's wholesale failure to monitor Johnson's blood sugar levels is the key factor. The district court found nothing in the record required Williams to test Johnson's blood sugar. (JA1011-1012). Yet, blood sugar tests were ordered in the first medical record created during Johnson's detention—signed by both Williams's supervisor and a physician. (JA311) ("BS x 3 times a day"). Williams defied this order, forgoing nearly twenty blood sugar tests over six days. Williams' indifference was further crystalized when, after finally testing Johnson's blood sugar, he made no substantive

response to a dangerously high result (245 mg/dL). The district court discounted this result, concluding Johnson's pre-incarceration records show it was not abnormal. (JA1014). But, those records actually show Johnson's blood sugar never approached 245 when properly managed, and Johnson faced grave danger if he missed meals. (JA167, JA170).

Third, in granting the CCDC Employees summary judgment, the district court failed to account for substantial evidence of deliberate indifference. Rice and White were required to track and report Johnson's malnutrition, but Adams admits they did not. (JA945). While Appellees dispute this amongst themselves, Williams testified the CCDC Employees also failed to properly notify him of Johnson's breathing troubles. (JA897). Altogether, Williams and the CCDC Employees' conduct interfered with and delayed Johnson's access to crucial medical care. These are precisely the types of misconduct recognized by the Supreme Court as deliberate indifference since Estelle and Farmer. Those cases, taken together with this Court's unambiguous ruling in Scinto on deliberately indifferent diabetes management, show the district court erred in granting qualified immunity.

Johnson's arrest and detention should not have caused his suffering and painful death. His diabetes was known by his jailers, and the necessary tests were easily accessible and expressly required by physician's order. A reasonable jury could conclude Williams's refusal to test Johnson, and the CCDC Employees'

repeated failure to report his obvious decline, exhibited deliberate indifference and infringed on Johnson's due process rights.

## STANDARD OF REVIEW

This Court reviews a district court's order denying summary judgment *de novo*. Jennings v. Univ. of N.C., 482 F. 3d 686, 694 (4th Cir. 2007). Accordingly, the Court must consider all pleadings and allegations and determine whether there is a genuine issue of material fact to be submitted to a trier of fact. Fed. R. Civ. P. 56(c). A court may not "try the case in advance by summary judgment." Pierce v. Ford Motor Co., 190 F. 2d 910, 915 (4th Cir. 1951). In reviewing the district court's order, an appellate court "must assess the evidence as forecast in the documentary materials before the district court in the light most favorable to the party opposing the motion." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

## ARGUMENT

An individual in state custody retains the right to access the essentials of life ("adequate food, clothing, shelter, and medical care"). Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Incarceration prevents a person from procuring these items, so the government must step forward to fill the void. Pfaller v. Amonette, 55 F.4th 436, 452 (4th Cir. 2022) (quoting Brown v. Plata, 563 U.S. 493, 510 (2011)). For convicted criminals, the state's duty stems from the Eighth Amendment's bar on cruel and unusual punishment. Prison is meant to punish, but the conditions of a prisoner's confinement must not deny him basic sustenance or leave him to suffer from a

treatable ailment. For a pretrial detainee, the constitutional right has a different source and offers more robust protection. A detainee is only suspected of crime, he retains the presumption of innocence, and the Fourteenth Amendment's Due Process Clause protects him from any form of punishment during his detention.

Johnson was arrested in July 2019 and detained in CCDC staffed by the CCDC Employees and Williams. Prior to his detention, Johnson was actively treated for uncontrolled type-2 diabetes monitored daily with multiple blood sugar tests. But, once Johnson's world was reduced to a CCDC holding cell, his daily testing was taken away entirely. Williams knew Johnson's booking forms documented a diabetes diagnosis and included a doctor's order requiring Johnson receive blood sugar tests three times every day. Yet, Williams chose to defy this order, and, for the next six days (July 11-16, 2019) he did not once prick Johnson's finger to check his blood glucose levels.

Johnson's physical deterioration and painful decline was entirely predictable and plainly observable as he stopped moving, eating, communicating, and breathing normally. CCDC Employees saw Johnson's decline, had the authority to call an ambulance, but chose not to act. Williams continued to take no action to monitor Johnson's blood sugar. By the time Williams finally performed an initial test, Johnson's blood sugar level was so far above his pre-detention baseline that he urgently needed emergency medical care in a hospital setting. Even then, Williams

continued to defy the physician's order by letting hours pass without a follow up blood sugar test.

By noon that day, Williams had even stopped going by Johnson's cell to check on him. For nearly four hours that afternoon, Williams had no idea of Johnson's condition. (JA921). Williams was only roused from his indifference when he learned Johnson collapsed and was in the midst of a medical crisis where his organs were shutting down. Hampered by the delay caused by Williams and the CCDC Employees' inaction, EMS and physicians at two hospitals could not save Johnson. He died on July 19, 2019, from the effects of DKA, a known but deadly complication of the manageable medical condition Williams and the CCDC Employees ignored.

The district court granted Williams and the CCDC Employees summary judgment, concluding Johnson's condition only became a "serious" medical need when he had been reduced to vomiting black material on the afternoon of July 17th. The district court further concluded neither Williams's week-long failure to monitor Johnson's blood sugar or his hours-long failure to act on the alarming July 17th test result were enough for a jury to find deliberate indifference. These rulings do not align with the evidence in the record or follow governing precedents, and the district court's ruling should be reversed.

1. **Williams's and the CCDC Employees' misconduct must be evaluated for "objective unreasonableness," not subjective recklessness.**

Ms. Johnson's section 1983 claim alleges Williams and the CCDC Employees' acts and omissions during her son's July 2019 detention denied him the substantive due process protections guaranteed by the Fourteenth Amendment's Due Process Clause. That Clause protects detainees like Johnson from government action lacking a rational relationship to any "nonpunitive governmental purpose" or that is "excessive in relation to that purpose." Kingsley v. Hendrickson, 576 U.S. 389 (2015) (quoting Bell v. Wolfish, 441 U.S. 520, 561 (1979)). The Supreme Court has always considered two components to evaluate an incarcerated person's inadequate medical care claim—(1) whether the care denied and the harm suffered were sufficiently substantial to rise to a constitutional deprivation; and (2) whether the deficient caregiver acted with a sufficiently culpable state of mind to support a constitutional claim. Scinto, 841 F.3d at 225 (citing Farmer, 511 U.S. at 834).

The first component is an objective analysis and has remained unchanged since Farmer. The incarcerated person must have been deprived of "the minimal civilized measure of life's necessities" to a degree that is "sufficiently serious" to form a constitutional violation. Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). This Court defines "sufficiently serious" to mean the deprivation of a protected interest posing a "serious or significant physical or emotional injury" or a "substantial risk

of such serious harm." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (quoting Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993)). When the "life necessity" an incarcerated person lost is a basic level of medical care, the loss is sufficiently serious as long as the inmate's medical condition was diagnosed by a physician as one requiring treatment or was so obvious that even a lay person would recognize it needed a doctor's care. Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

The second component looks to the other side of an incarcerated person's claim by focusing not on the inmate's loss but on the state actor's error. Due process claims must be targeted at "conscience-shocking" government action. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). What shocks the conscience varies by circumstances, but is met by acts or omissions showing deliberate indifference to an incarcerated person's serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Since 1976, the meaning of "deliberate indifference" developed mainly in the context of prisoners, i.e. incarcerated persons convicted of a crime and serving prison time as punishment for their offense. Applying Eighth Amendment principles, the Supreme Court determined deficient medical care does not present a constitutional issue unless the provider "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.

Simply put, poor medical care becomes impermissible "punishment" only when the deficient medical provider is "aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists," and the provider draws that inference. Id.; Scinto, 841 F.3d at 225. Since a state official is unlikely to admit consciously disregarding a grave risk, subjective knowledge may be inferred from circumstantial evidence. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004). A risk may be so obvious that an official cannot credibly deny knowing it, and an official's conduct can be such a patently inadequate response that the official cannot claim it was mere negligence. Farmer, 511 U.S. at 842. Classic examples of deliberately indifferent medical care include needlessly denying or delaying care and interfering with the treatment prescribed by the inmate's physician. Estelle, 429 U.S. at 104-05.

That standard cannot be grafted on to Ms. Johnson's claim for deficient medical care. Johnson's status as a pretrial detainee rather than a prisoner shielded him from facing *any* form of punishment while confined at CCDC. Kingsley, 576 U.S. at 400-01 (citing Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40 (1977)). Four years before Johnson's death, the Supreme Court confirmed Eighth Amendment and Fourteenth Amendment-based condition of confinement claims are distinguishable because their constitutional sources protect different interests. Kingsley, 576 U.S. at 400-01. While prisoners may only prove deliberate indifference by showing a prison official's subjective awareness and subjective disregard of the risk of serious harm,

a pretrial detainee need only show what a jail official did (or failed to do) was "objectively unreasonable." Id. at 396-97.

Kingsley's holding sets the standard for Ms. Johnson's claim that Williams and the CCDC Employees acted with deliberate indifference to Johnson's serious medical needs. Ms. Johnson need not prove Williams or the CCDC Employees intended Johnson harm or that they were subjectively aware their failure to act seriously risked causing harm. Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023). Instead, Ms. Johnson prevails by showing:

> (1) [Johnson] had a medical condition or injury that posed a substantial risk of serious harm;
>
> (2) [Williams and the CCDC Employees] intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;
>
> (3) [Williams and the CCDC Employees] knew or should have known
>
> > (a) that [Johnson] had that condition and
> >
> > (b) that [Williams and the CCDC Employees'] action or inaction posed an unjustifiable high risk of harm; and
>
> (4) as a result, [Johnson] was harmed.

Id. As discussed below, Williams's choice to disregard a physician's order and Williams's/the CCDC Employees' reckless failure to timely procure emergency medical care meet all the required elements. Therefore, the district court erred in granting judgment as a matter of law on the section 1983 due process claim.

## 2. Johnson's diabetes-related decline posed a substantial risk of serious harm prior to the afternoon of July 17, 2019.

The district court's first legal error was in dramatically shrinking the timeline of Appellees' acts and omissions. The district court cast aside Williams's and the CCDC Employees' choices from Johnson's booking on the afternoon of July 11, 2019, through the afternoon of July 17, 2019, by concluding Johnson's medical condition only posed a substantial risk of serious harm that afternoon. (JA1011-12; JA1067). In so doing, the district court ignored his medical conditions identified at booking, his overt physical decline over five days, and the alarming acceleration of his deterioration during the morning of July 17th.

There is no dispute Johnson presented with a number of behavioral, emotional, and mental health conditions at booking including anxiety, depression, and obsessive compulsive disorder. (JA494, JA310). He was actively contemplating suicide. (JA310). Additionally, Johnson's physical ailments included hyperlipidemia, hypertension, and type-2 diabetes. (JA310). Even a layperson could see Johnson's complicated medical profile required CCDC's medical providers to act immediately. (JA494-495). The diabetes was an especially significant concern. Evidence in the record shows Johnson had been treated by a diabetes specialist who concluded his condition was "not controlled," requiring daily tests and two medications(JA170).

This evidence alone is sufficient to meet the objective "seriousness" component of the deliberate indifference analysis. A medical need is "serious" anytime an ailment has been diagnosed by a physician as one requiring treatment. Iko, 535 F.3d at 241 (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)). Other federal courts recognize the essence of a "serious" medical need lies in the peril the inmate can face if ignored. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) ("a serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain").

As to Johnson, a leading Fourth Circuit precedent involving an inmate's medical care held it is a "well-known" fact that diabetes is a "common yet serious illness that can produce harmful consequences if left untreated for even a short period of time." Scinto, 841 F.3d at 230; see also Kovari v. Brevard Extraditions, LLC, 461 F. Supp. 3d 353, 383 (W.D. Va. 2020) (finding jury question on serious medical need issue where inmate had "hypertension, prediabetes, and obesity); Beatty v. Davidson, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010) ("This Court need not linger on this point: diabetes is a sufficiently serious medical condition"). That is because the mortality rate for diabetes complications like DKA can be up to 50%. Lolli v. Cnty. of Orange, 351 F.3d 410, 419 (9th Cir. 2003) (citing "Diabetes in America" 5 (Maureen I. Harris et al. eds. 2d ed. 1995)).

Williams raises two objections to finding Johnson's diabetes was a "serious" condition posing a substantial risk of harm. First, Williams contends the "seriousness" of diabetes is limited to the type-1 variety or to insulin-dependent diabetics. (JA88). However, federal courts have rejected this limitation. See e.g. Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999) (analyzing claims arising from prison officials' alleged failure to provide non-insulin diabetes medication typically prescribed to patients with type-2 diabetes). Second, Williams argues Johnson's diabetes was not "serious" and posed no risk until it caused a medical emergency. (JA1006). But, the Constitution does not allow state actors to deny inmates medical care until their potentially-manageable medical condition spins out of control. This Court has expressly rejected Williams's notion that "serious" medical need only applies to the "acute" phase of a chronic condition. Gordon v. Schilling, 937 F.3d 348, 359 (4th Cir. 2019) ("it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates"); Ford v. Anderson Cnty., Tex., 102 F.4th 292, 310 (5th Cir. 2024) (citing Gordon, 937 F.3d at 360-61).

After booking, Johnson's substantial risk of serious harm became increasingly severe and obvious while Williams and the CCDC Employee took little action. With limited exceptions, Johnson was immobile for days. (JA390) ("He was just . . . lying

on his bunk"). The district court concluded his sedentary status was merely an inevitable byproduct of incarceration. (JA1007-1008; JA1065). But, that is not the way the CCDC Employees saw it. Rice noticed Johnson's overall condition deteriorated during his detention. (JA390). White testified to a notable change in Johnson's appearance during his time at CCDC. Johnson appeared "different" as he wasted away in his cell, and White was certain "he changed from the . . . first day I saw him." (JA682-683).

Johnson's behavior also changed. As his decline accelerated, Johnson "just stopped eating." (JA390). This was not an isolated incident limited to Johnson's final day at CCDC. He had not eaten dinner on July 16th nor lunch on July 17th. (JA393-394). In fact, Adams' review of Johnson's inmate logs showed Johnson refused meals for two full days. (JA561-562). Then, Johnson began to have difficulty breathing. This, too, was not limited to July 17th. The CCDC Employees first noted Johnson's respiratory issues during the night shift from July 16th to July 17th. (JA520; JA552-553). Consistent with this physical and testimonial evidence, Ms. Johnson's expert Dr. Bazzel described Johnson's condition as "greatly deteriorated" over the week of his detention such that anyone who encountered him—medical professional or layman—should have known he needed emergency medical care. (JA720).

By ruling Johnson's condition only posed a serious risk of substantial harm on the afternoon of July 17th, the district court also disregarded plentiful evidence of Johnson's perilous situation from that morning. His declining condition had begun overtly affecting his respiratory system, motor skills, and cognition. When Adams arrived for her morning shift, she received a report that Johnson was "breathing different" and had been throughout the previous night's (July 16-17, 2019) shift. (JA517; JA520). By 8:00 a.m., Adams saw Johnson breathing loudly and wheezing. (JA519-520). She recognized this as a serious matter ("something was going on") that needed to be addressed immediately. (JA521-22). Adams went by the cell twice more that morning and observed Johnson continue to breathe loudly (JA523-524). Similarly, at 9:40 a.m., Rice saw Johnson breathing "very heavily." (JA402). She too agreed Johnson's breathing troubles presented a significant, serious issue. (JA406-407).

Then, as other CCDC personnel arrived to escort Johnson for a breathing treatment, Johnson reported he could not physically walk to the medical office. (JA527). This placed the CCDC Employees on further notice Johnson's ailment had now rendered him incapable of performing basic physical tasks. Johnson could not take 20-25 steps to walk the 10-20 feet from booking to medical (JA410; JA628-629, JA823), further signaling his condition was becoming a "more emergency situation." (JA527-28).

Finally, Johnson's cognitive decline shows his condition posed a serious risk of substantial harm far earlier than the district court recognized. When Johnson sat for a mental health visit on the morning of July 17th, the mental health worker reported she was "unable to assess" him. (JA316). He could not coherently answer questions and was disoriented as to his location. (JA316; JA899). Even Williams admits this is not normal behavior. (JA900). By concluding Johnson's ailments did not pose a substantial risk of serious harm prior to the afternoon July 17, 2019 (JA1011-1012; JA1067), the district court ignored CCDC records, CCDC Employees' testimony, and an expert's opinion. The district court was not free at the summary judgment stage to set this evidence aside or to make its own evaluation of the witnesses' credibility.

Finally, the district court concluded there was insufficient evidence to suggest Williams either knew or should have known Johnson's condition posed a substantial risk of serious harm during this period. (JA1008; JA1065). However, the record actually suggests Williams knew Johnson was a diabetic who, even before July 17th, was not moving, was not eating, and was in the midst of an overt physical decline culminating in breathing issues. The CCDC Employees testified they told Williams about Johnson's physical deterioration. When White observed Johnson's "different" look during 15-minute checks, this was something she would bring to the nurse's attention. (JA682). Rice personally told the medical staff Johnson was not eating.

(JA391). Additionally, Williams knew of Johnson's immobile status because he was directly told and had access to logs showing Johnson's inactivity (JA419). According to Adams, Williams was also promptly told Johnson's breathing struggles began overnight. (JA553). Accordingly, the district court erred as a matter of law in concluding there was no evidence Williams was on notice of Johnson's serious condition prior to July 17th.

### 3. Williams's egregious mismanagement of Johnson's diabetes is a classic example of deliberate indifference.

The district court also erred in its analysis of deliberate indifference's second component. Williams, the district court concluded, lacked the culpable state of mind to support deliberate indifference because he provided "some level of care" on July 17th, and a jury could find his conduct on that day was objectively reasonable. (JA1012-1014; JA1067).[2] However, the record is filled with evidence showing Williams acted with deliberate indifference in the classic sense. Even under the

---

[2] Along with the substantive errors described in this section, the district court's ruling on this point is also procedurally improper. The order granted Williams summary judgment by concluding "the evidence supports a finding that Williams's actions were objectively reasonable . . ." (JA1067). Even if true, that would not be enough to support the district court's ruling. Williams has to show "there is no genuine dispute as to any material fact" to obtain summary judgment. Fed. R. Civ. P. 56(a). Showing a reasonable jury could rule in his favor is insufficient. Williams's burden was to show *no reasonable jury could rule in Ms. Johnson's favor*. Perini Corp. v. Perini Constr. Co., 915 F.2d 121, 124 (4th Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party")).

elevated conception of deliberate indifference for Eighth Amendment claims, the Supreme Court has held for fifty years that a state actor is deliberately indifferent if he "interfer[es] with" the medical treatment a physician prescribes for an inmate or if he "den[ies] or delay[s] access to medical care" for an inmate in need. Estelle, 429 U.S. at 104-05. Both are present here. Williams interfered with the medical treatment prescribed for Johnson by ignoring a physician's order for thrice-daily blood sugar tests. Then, on July 17th, Williams needlessly delayed in seeking emergency care for Johnson's dire medical condition.

**a. Williams defied a physician's order requiring blood sugar tests for Johnson three times per day.**

The "interference" form of deliberate indifference discussed in Estelle can take a variety of forms. Estelle itself cited an earlier ruling from this Court holding that a prison official could face liability if he "willfully deprived" an inmate of medical care ordered by a physician. Estelle, 429 U.S. at 105 n. 12 (citing Edwards v. Duncan, 355 F.2d 993, 994 (4th Cir. 1966)). Estelle referenced numerous cases permitting suit against a non-medical state actor for willfully getting between a detainee and the medical care he needs. Estelle, 429 U.S. at 105 n. 12 (citing Wilbron v. Hutto, 509 F.2d 621, 622 (8th Cir. 1975) (prison officials forcing inmate to work despite physician's order for hand surgery), Campbell v. Beto, 460 F.2d 765 (5th Cir. 1972) (warden forcing inmate to perform manual labor despite documented heart condition), and Tolbert v. Eyman, 434 F.2d 625, 626 (9th Cir. 1970) ("the

warden refused to allow [inmate] authorized medicine that he needed to prevent serious harm to his health").[3]

Most pertinent is the well-settled recognition that a nurse acts with deliberate indifference when he prevents the implementation of a physician-directed treatment modality. For example, in <u>Smith v. Smith</u>, this Court found a viable deliberate indifference claim where an inmate alleged a prison nurse "destroyed the means for him to access the medical treatment ordered by the doctor" by ripping up a doctor's order for an antifungal medication to treat the inmate's foot infection. 589 F.3d 736, 739 (4th Cir. 2009). <u>Smith</u> shows that "[b]y destroying the means for the inmate to access treatment, the nurse ultimately deprived him of necessary care." <u>Pfaller</u>, 55 F.4th at 453. <u>Pfaller</u> applied the same principle to affirm the denial of summary judgment to a doctor who defied his supervising physician by failing to conduct medical tests on an inmate whose lab results qualified him for further testing under a protocol the supervisor had developed. <u>Id.</u> at 449 (holding that a "reasonable jury

---

[3] <u>See also</u> <u>Scarberry v. Bowman</u>, 16 F.3d 411 (Table), 1993 WL 539498, at * 2 (4th Cir. Dec. 30, 1993) (prison supervisor canceling inmate's appointment with physician); <u>Oglesby v. Stevenson</u>, Civil Action No. 8:13-3378-TMC-JDA, 2014 WL 7409592, at * 5 (D.S.C. Dec. 31, 2014) (guards refusing to permit inmate the treatment ordered for his anal fissures); <u>see also</u> <u>Gilmore v. Hodges</u>, 738 F.3d 266, 276 (11th Cir. 2013) (jail officials denying inmate hearing aid batteries); <u>Rodriguez v. Jabe</u>, 904 F.2d 708, 1990 WL 82722 (6th Cir. June 19, 1990) (guards refusing to provide crutches after inmate's knee surgery).

could conclude that [defendant physician] knew [inmate] qualified for additional testing but declined to do anything about it").

Consistent with Smith and Pfaller, a number of other federal appellate courts have held a nurse or other medical provider acts with deliberate indifference by failing to implement a supervising provider's order. E.g. Gil v. Reed, 381 F.3d 649, 662-64 (7th Cir. 2004) (holding a doctor's failure to follow a specialist's recommendation created a genuine issue of fact as to whether the doctor subjectively disregarded the serious medical risk to the patient); Montgomery v. Pinchak, 294 F.3d 492, 500-01 (3d Cir. 2002) (finding viable deliberate indifference claim based on allegation that prison officials "refused to provide him with" the medication and tests "that their own medical staff . . . had determined were necessary for treating" HIV); Boretti v. Wiscomb, 930 F.2d 1150, 1154 (6th Cir. 1991) (finding valid deliberate indifference claim when nurse "refused to carry out" treatment plan by failing to change dressing on inmate's wound for five days); See also Bolling v. Carter, 819 F.3d 1035 (7th Cir. 2016) (finding viable deliberate indifference where evidence suggested corrections officers ignored prison doctor's order to place injured inmate in a lower bunk).

Here, the record shows Williams ignored a crucial order for testing Johnson's blood sugar. The district court discounted this failure, concluding (in a footnote) Ms. Johnson failed to show blood sugar tests were part of the standard of care. (JA1008;

JA1066). That ruling overlooks a host of contrary evidence and admissions. Johnson's CCDC medical file included an order for daily blood sugar tests. An "Admission Data/History and Physical Form" documented Johnson's type-2 diabetes and the two anti-diabetes prescriptions he was actively taking. (JA310-311). Notably, the form's second page leads with a handwritten note reading "BS x 3 times a day." (JA311). That note was written by Price, a SHP nurse, SHP's medical team administrator at CCDC, and Williams's direct supervisor. (JA781). Price signed at the bottom of that page as Johnson's "Physical Examiner." (JA311). Crucially, a physician signed off immediately below Price and on the same date, affirming the form's instructions were also a physician's plan for Johnson's medical care. (JA311).

An order for multiple daily blood sugar tests is not surprising. The record establishes daily testing as the minimum level of care for addressing diabetes. Prior to his arrest, Johnson was ordered to "test blood sugar twice daily before breakfast and dinner" (JA167) and anytime he intended to drive a car. (JA170). Similarly, SHP policy required multiple daily blood sugar tests because diabetes is a "chronic care condition." (JA841). To address these daily concerns, SHP provided a "Chronic Care Tracking Log" form (JA842) and required diabetes be documented in a "Master Problem List" form (JA844).

SHP also has a specific high blood sugar treatment protocol (JA848). Williams admitted he was familiar with this protocol (JA848) which included a provision stating "Normal FPG[4] is lower than 126." (JA849-850). In SHP's view, any fasting blood sugar over 126 would be considered abnormally high and require tracking. SHP even had "blood sugar check book" forms for documenting periodic blood sugar test results. (JA885). Testing blood sugar multiple times per day was such a commonsense protocol for diabetic inmates that even layman correctional officers recognized it as a requirement. (JA512). It was not, as Williams has suggested, a protocol limited to any subset of diabetic patients. As Adams testified, "if *anybody* comes in as a diabetic . . . they are to be checked before their meals in the mornings, evenings, and the afternoon." (JA545) (emphasis added).

Even Williams admitted it would be inappropriate for a diabetic patient to go six days after booking without a single blood sugar test. (JA849) (stating he would expect an initial blood sugar test at booking to determine whether high blood sugar protocol applied). Additionally, Ms. Johnson presented Dr. Bazzel's expert affidavit in which he states any known diabetic booked into a correctional facility must be given blood sugar tests three times per day. (JA718). He further concluded that not

_____

[4] "FPG" is an acronym for "fasting plasma glucose," a synonym for blood sugar measured after a period without food consumption. "Blood Glucose Test," MedlinePlus, National Library of Medicine, *available at* https://medlineplus.gov/lab-tests/blood-glucose-test/.

doing these tests would be a conscious failure to implement a required medical intervention. (JA718).

Thus, the district court erred as a matter of law in concluding Ms. Johnson failed to establish thrice-daily blood sugar tests were the standard of care for Johnson's medical treatment. Those tests were ordered by a physician, required by SHP policy, recognized as standard procedure by the CCDC employees, identified as the standard of care by an expert, and at least partially acknowledged as required by Williams himself. Finally, there is no real question as to whether Williams failed to implement this order. (JA887) ("it doesn't appear that he was checked three times a day, no"). Nor can Williams offer any excuse for ignoring the order. He has admitted its text was unambiguous. (JA873) (agreeing "BS x 3 times a day" means a test of Johnson's "blood sugar should have been done three times a day"). He acknowledged the form bearing that instruction was signed by both a physician and his direct supervisor. (JA861). And he conceded performing a blood sugar test is neither technically challenging nor time consuming. (JA900).

In sum, interfering with ordered medical treatment is a recognized form of deliberate indifference even under the more rigorous subjective Eighth Amendment analysis. Here, the record includes plentiful evidence showing Williams was ordered to check Johnson's blood sugar three times a day but never implemented that order. Consistent with this Court's rulings in Smith and Pfaller, a reasonable jury could

conclude Williams's failures rose to the level of deliberate indifference. Accordingly, the district court erred in granting Williams summary judgment.

### b. Williams was indifferent to Johnson's dangerously high blood sugar test on July 17th.

After nearly a week of refusing the duty to perform blood sugar tests imposed by physician order, his employer's protocols, and CCDC standard practice, Williams finally checked Johnson's blood sugar around 8 a.m. on July 17, 2019. (JA908-909)). Yet, Williams compounded his error with further indifference and delays when the test results came back at an alarmingly high 245 mg/dL.

Williams cannot point to this single blood sugar test to avoid liability by arguing he at least did one test. Deliberate indifference is not limited to instances where a state actor fully refuses to care for an inmate. De'Lonta, 330 F.3d at 526. Contrary to the district court's reasoning, Williams is not entitled to summary judgment simply because he was "providing some level of care." (JA1014; JA1067). Johnson was entitled to more than "some level" of care. Due process demanded he receive "constitutionally adequate" treatment, and "[g]rossly incompetent or inadequate care" is as much deliberate indifference as is a total refusal to assist an ailing inmate. De'Lonta, 330 F.3d at 526; Hixson v. Moran, 1 F.4th 297, 303 (4th Cir. 2021) (medical treatment shocks the conscience when it is "grossly incompetent [or] inadequate"). Moreover, a state actor can display his indifference by waiting too long to provide the care he knows an inmate needs. Delaying crucial care is another

of the paradigmatic examples of deliberate indifference recognized in <u>Estelle</u>. 429 U.S. at 104-05.

Williams's July 17th indifference began with his refusal to perform a follow up blood sugar test. As discussed above, a physician's order and SHP policy required Johnson receive three tests per day. At CCDC, a diabetic patient's blood sugar tests were performed at meal times. (JA545). Since the test Williams performed took place at around 8 a.m. (JA908-909), Johnson was due his second test around noon. Williams refused to perform this test, and this failure further demonstrates he provided Johnson deliberately indifferent medical care.

Williams's lack of substantive response to the 245 mg/dL test result he did collect was also grossly inadequate and incompetent care. This test result was a flashing red light of danger. Per SHP policy, any fasting blood sugar over 126 was considered high. (JA850). The fasting blood sugar standard was the proper one to apply here since Johnson had not been eating for two days. (JA561-562). Williams knew Johnson was not eating, and he did not bother to check on Johnson's caloric intake. (JA419; JA910-911). Armed with pertinent information showing Johnson's lack of appetite and his 245 mg/dL blood sugar result, Williams knew the SHP high blood sugar policy applied here. It was an act of indifference to not immediately transfer Johnson to the hospital (or even perform a second blood sugar test). <u>See</u> <u>Short</u>, 87 F.4th at 613 (quoting <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir.

2018) (finding policy violation is "instructive both in determining the seriousness of the risk posed and in determining whether an [official] knew of the 'excessive risk posed by the official's action or inaction'")).

Shockingly, Williams argues a 245 mg/dL blood sugar reading was no cause for concern. He claims this result was "not significant" because it was "within normal range" for Johnson. (JA82). Williams further argues one sentence in Johnson's MUSC medical record from April 2019 confirms this blood sugar result was normal. (JA82). But, if Williams seeks refuge in the MUSC record, then he must acknowledge the substance of that record in its entirety. That record certainly does not suggest it was ever normal for Johnson's blood sugar to reach 245 mg/dL. In fact, Johnson's doctor included a detailed chart of his normal blood sugar range:

Fasting blood sugars:      90-120

Pre-lunch blood sugars:   67-170

Pre-dinner blood sugars:  200, 170s

(JA167). A 245 reading was 45 mg/dL more than the highest end of Johnson's normal range under any circumstances and more than double the high end of Johnson's fasting blood sugar range. This is the more pertinent comparison given Johnson's lack of consumption in the days before his death.

The MUSC record is also notable for stressing the importance of how monitoring Johnson's food intake impacted his blood sugar levels. Johnson missing

meals would have an extremely detrimental impact on his diabetes management, especially with one of the medications Williams dispensed to him. (JA170) ("He should not be skipping meals on Glipizide"); (JA128). This is further evidence of how egregious it was for Williams to ignore information on Johnson's food intake. In total, the MUSC record shows Johnson's diabetes was "not controlled" and, therefore, it was essential his blood sugar be checked multiple times per day. (JA166) ("uncontrolled treatment of Type 2 Diabetes"); (JA167) ("test blood sugar twice daily"). Thus, the single sentence Williams selectively cites from this record cannot be reconciled with other portions that actually prove (1) a 245 mg/dL blood sugar reading was far outside of Johnson's normal range; (2) it was essential Johnson's food intake be monitored while he was taking diabetes medications; and (3) multiple daily blood sugar tests were the bare minimum required to credibly claim to be caring for Johnson's uncontrolled diabetes.

Williams's misleading resort to the MUSC record is perhaps offered as a causation defense. Williams seems to say his indifference to Johnson's blood sugar caused no harm because 245 mg/dL is not so bad. Yet, the MUSC record rejects that conclusion. So does Dr. Bazzel's expert affidavit. The 245 mg/dL reading, along with the other information Williams had, showed "DKA was likely in this case and [Williams] should have reacted accordingly." (JA720). Dr. Bazzel's analysis of the medical evidence led him to conclude the consistent, daily tests required for

Johnson's care would have shown his blood sugar was "consistently" "too high" and required "immediate transfer to the closest hospital." (JA719-720).

Williams's indifferent response to the July 17th blood sugar test led directly to his final act of deliberate indifference—needless delaying the call to emergency medical services to have Johnson transferred to the hospital. The facts of this case highlight that delayed care can be just as deadly and is just as actionable as care denied. Doing nothing is quite often how deliberate indifferent medical care manifests. Smith v. Smith, 589 F.3d at 739 (citing Estelle, 429 U.S. at 104-05 n. 11); Mata v. Saiz, 427 F.3d 745, 755 (10th Cir. 2005) (deliberate indifference met with "showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [inmate's] condition"). In situations like Johnson's where the disease is serious and his condition is dire, even a short delay can constitute deliberate indifference. Darrah v. Krisher, 865 F.3d 361, 368 (6th Cir. 2017) ("Even relatively short periods of delay or neglect" can be sufficient to show a medical provider's deliberate indifference).

The district court concluded the record "establishes" Williams "provided consistent care" to Johnson "through the morning and early afternoon" of July 17th. (JA1012-1013). The record, including Williams's own testimony, contradict this conclusion. While the progress notes Williams wrote identify multiple interactions with Johnson in the morning hours of July 17th, Williams made no effort to treat or

even observe Johnson's condition in the early afternoon for nearly four hours. (JA313); (JA917) (noting Williams stayed away for four hours); (JA921) (explaining he did not how Johnson was doing).[5] This was despite the fact that (1) Johnson's blood sugar was an abnormally high 245 mg/dL four hours earlier; (2) Johnson had recently lost the ability to walk 25 feet from his cell to the medical office; (3) Johnson was disoriented to time and place; (4) Johnson was still not eating as he did not take lunch; and (5) Williams had been explicitly instructed by Dr. Wimberly to continue the close monitoring required for suicide watch. Despite all this, Williams chose for the first time that day to stay away from Johnson for nearly four hours. (JA917).

In sum, the district court erred in concluding Ms. Johnson failed to present sufficient evidence to show Williams had the requisite culpable state of mind to support deliberate indifference. In the week Johnson was detained, Williams manifested his indifference in the precise ways the Supreme Court discussed in Estelle. Williams interfered with prescribed medical care by refusing to check Johnson's blood sugar three times per day as the "Admission Data/History and

---

[5] A delay of this length sufficiently proves Williams's deliberate indifference given these circumstances. See Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 844-45 (6th Cir. 2002) (one hour delay after being paged to attend to the prisoner); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (few hours delay in treating inmate's broken foot); Lewis v. Wallenstein, 769 F.2d 1173, 1183 (7th Cir. 1985) (15-minute delay in treating inmate in cardiac arrest).

Physical Form" plainly required. Then, on July 17th, Williams provided grossly incompetent and inadequate care by taking no substantive action in response to a 245 mg/dL blood sugar reading that was abnormally high under SHP policy and for Johnson personally. Finally, Williams needlessly delayed getting Johnson the emergency care he needed by going hours that afternoon without checking on Johnson's progress.

**4. The CCDC Employees' failed to inform medical personnel of crucial information and failed to seek medical care when Johnson was in their charge.**

Adams, Rice, and White also stood between Johnson and the critical medical care he needed. Rice and White (under Adams's supervision) were tasked with the 15-minute checks Johnson was to receive as a suicide watch inmate. The record shows Adams, Rice, and White observed Johnson's rapid physical deterioration during these checks, recognized multiple key aspects of this decline as essential to his medical treatment, yet chose to withhold that information from Williams and others in the medical office. These failures are sufficient to show deliberate indifference to Johnson's serious medical needs.

Corrections officers may face liability for deliberate indifference even in situations where an inmate is under medical professionals' care. While there are instances where the officers can rely on and defer to the judgment of medical personnel, "officers face liability for their own decisions, made while [an inmate]

was in their charge." Iko, 535 F.3d at 242. Corrections officers are also not immune from claims of deliberately indifferent "interference" with medical care including a wide variety of conduct designed to deny a detainee access to care or to deprive him of medical treatment previously ordered. E.g. Scarberry, 1993 WL 539498, at * 2 (prison supervisor canceling inmate's appointment with physician); Oglesby, 2014 WL 7409592, at * 5 (guards refusing an inmate's treatment ordered for anal fissures).

A corrections officer also effectively interferes with an inmate's medical care when the officer recklessly provides an incomplete, inaccurate, or misleading description of the inmate's condition to a medical provider. Smith v. Lisenbe, 73 F.4th 596, 601 (8th Cir. 2023) (suggesting corrections officers may be guilty of deliberate indifference if they "withheld relevant information from medical professionals"); Darrah v. Krisher, 865 F.3d at 371 (finding nurse's failure to relay inmate's complaint to physician could constitute deliberate indifference). An officer observing a change in an inmate's condition that the officer recognizes as important to the inmate's medical care stands in a "gatekeeping" role between the inmate and responsive medical care. Crowson v. Washington Cnty., Utah, 983 F.3d 1166, 1179 (10th Cir. 2020) (nurse who knew inmate had "potentially alarming symptoms and suspected there was a medical issue" had "duty as a gatekeeper to provide [inmate] access to medical personnel who could provide care").

An officer violates their duty by failing to communicate crucial information to the inmate's treatment providers. <u>Paugh v. Uintah Cnty.</u>, 47 F.4th 1139, 1164 (10th Cir. 2022) (corrections officer's "failure to accurately convey [inmate's] symptoms to [physician's assistant] may be evidence of deliberate indifference" as reasonable jury could find officer "failed to fulfill his gatekeeping role by not "communicating [inmate's] symptoms to a higher-up"); <u>Reece v. Hale</u>, 58 F.4th 1027, 1033 (8th Cir. 2023) (citing <u>McRaven v. Sanders</u>, 577 F.3d 974, 981 (8th Cir. 2009) (finding viable deliberate indifference claim when "jail personnel had neglected to tell the nurse what they knew" leading to nurse operating under "faulty assumption").

Here, Johnson was classified as a suicide watch inmate for the entirety of his detention. As such, he was subject to 15-minute checks conducted by CCDC officers. Those checks were not limited to determining whether Johnson was trying to harm himself. Rather, an officer also checked on Johnson's mood, facial expressions, talkativeness, and whether his overall condition had changed since the previous check. (JA642). To find otherwise, as the CCDC employees now suggest, would suggest they were allowed to turn a blind eye to the most basic human conditions, undermining their own admission and the practical purpose of the checks. In Johnson's case, White and Rice were responsible for conducting many of these checks. (JA674-675; JA380).

During the July 11-17, 2019 checks, the CCDC Employees made three important observations of Johnson's condition. First, Johnson was barely moving inside his cell. (JA390) ("He was just . . . lying on his bunk"). Second, Johnson stopped eating for multiple days. (JA390). Third, from overnight on July 16th to July 17th, Johnson began having breathing difficulties. (JA520). White summarized her observations during the 15-minute checks by testifying "Johnson changed . . . from the first day I saw him" and had a "different look" by the end of the week than he did at the beginning. (JA682-683). All of these observations were understood as important details for addressing Johnson's medical needs. (JA484-485) (inmate not eating is detrimental to his health); (JA390) (Johnson's lack of food consumption and movement were not a good thing); (JA405-406) (inmate with breathing troubles is a serious issue); (JA682) (inmate not eating should be brought to nurse's attention).

Yet, the record reveals the CCDC Employees were not properly communicating this important information to Williams or any other medical provider. Adams admits Rice and White were supposed to be advising both her and the medical department that Johnson was skipping meals but they failed to do so. (JA562). Williams testified that he was not told by the CCDC Employees about Johnson refusing meals (JA945). Similarly, there was a communication breakdown regarding the timing of Johnson's breathing difficulties. Williams testified he

operated under the assumption Johnson's first breathing difficulties began at 6:20 a.m., the time when Williams first saw Johnson on July 17th. (JA897). In truth, Johnson's breathing troubles started hours earlier during the July 16-17 overnight shift. But, according to Williams, the CCDC Employees did not inform him.[6]

The CCDC Employees' failure to adequately and accurately communicate Johnson's condition to Williams was hugely consequential. Williams testified medical providers rely on officers to provide timely and complete transmission of information on an inmate's status to "allow [the physician] to make the most educated diagnoses and medical recommendations." (JA932). Johnson's very recent history of skipping meals was important information Williams needed to receive so he could share it with Dr. Wimberly. (JA931). Nutritional issues were not only a general concern for diabetes patients, they also posed a specific risk because of the medications CCDC was administering to Johnson. (JA170) ("He should not be skipping meals on Glipizide").

The CCDC Employees' failure to communicate the timing of Johnson's breathing troubles was equally problematic. Williams says that, when he arrived at Johnson's cell on July 17th at 6:20 a.m., it would have been his routine practice to

---

[6] Admittedly, the CCDC Employees dispute Williams's assertions, claiming they did pass the essential information on to him. (JA391) (claiming Williams knew Johnson was not eating); (JA552-553) (testifying Williams knew Johnson's breathing issues had begun overnight on July 16th). Reconciling this contrasting testimony requires a credibility determination only a jury can perform.

ask the CCDC Employees when Johnson's breathing troubles began. (JA897). Williams does not remember the officers telling him Johnson's troubles had begun several hours earlier. As a result, Williams "assumed it would be at 6:20 that it started." (JA897). In other words, Williams began his entire course of treatment for Johnson on the crucial day at the end of his life with a false assumption regarding Johnson's respiratory status facilitated by the CCDC Employees' failures to communicate information they knew to be essential to Johnson's medical care.

The CCDC Employees also acted with deliberate indifference in their failure to immediately seek emergency medical care at multiple points during Johnson's detention. The CCDC Employees knew they had a duty to immediately obtain medical help for any inmate facing a medical emergency. (JA447). In fact, Rice admits the CCDC Employees were trained on identifying emergency medical conditions. (JA361). The corrections officers' duty for addressing an inmate's medical need was not simply limited to calling in Williams or another SHP-employed nurse. Rather, for the overnight hours when there was no nurse on premises, a senior corrections officer had the ability to call emergency medical services to address a serious medical issue. (JA470). According to Dr. Bazzel, Johnson's condition posed an emergency situation long before 3:50 p.m. on July 17th. (JA719). The medical and observational records show Johnson's physical condition "greatly deteriorated" over the course of his detention to such a degree that

"[a]nyone that saw and/or came into contact with [Johnson] during that time should have immediately known that he required emergent medical care." (JA719).

This expert opinion, along with their own testimony, was sufficient to defeat the CCDC Employees' summary judgment motion. A reasonable jury could conclude the CCDC Employees knew Johnson's movement, nutritional, and breathing issues were serious matters, but they chose not to communicate what they knew to Williams or Johnson's other medical providers. Moreover, Dr. Bazzel's opinion could lead a reasonable jury to conclude Johnson's condition was obviously serious and that withholding information on that condition from Williams was an obviously insufficient response. Accordingly, the district court erred and its award of summary judgment to the CCDC Employees should be reversed.

5. **In light of Williams's and the CCDC Employees' deliberate indifferent conduct, the district court erred in awarding summary judgment on their qualified immunity defense.**

The district court's qualified immunity ruling is inextricably tied to its analysis of the substance of Ms. Johnson's due process claim. (JA1015-1016; JA1022) (concluding Williams and the CCDC Employees were immune after ruling record failed to show constitutional violation). That ruling should not stand because, as detailed above, a reasonable jury could conclude Williams and the CCDC Employees each acted with deliberate indifference to Johnson's serious medical

need. Moreover, since Johnson's right to constitutionally adequate medical care was clearly established in July 2019, qualified immunity does not apply here.

The doctrine of qualified immunity can provide "government officials performing discretionary functions" protection from liability under section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would be aware." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity is intended to balance two important interests: "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" against "the need to hold public officials accountable when they exercise power irresponsibly." <u>Doe v. S.C. Dep't of Soc. Servs.</u>, 597 F.3d 163, 169 (4th Cir. 2010).

A defendant is not entitled to summary judgment on a qualified immunity defense when the evidence presents disputed issues of fact or turns on a credibility determination. <u>Tolan v. Cotton</u>, 572 U.S. 650, 656 (2014) (holding that for both a substantive constitutional inquiry and qualified immunity analysis "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"); <u>Rainey v. Conerly</u>, 973 F.2d 321, 324 (4th Cir. 1992). The Court must view the facts in a light most favorable to the plaintiff when deciding on the application of qualified immunity. <u>Gomez v. Atkins</u>, 296 F.2d 253, 260-61 (4th Cir. 2002). In practical

terms, the court must resolve all disputed facts in the plaintiff's favor. Gomez, 296 F.2d at 261.

To resolve questions of qualified immunity, the court must engage in a two-prong inquiry. The first question asks whether the facts, taken in the light most favorable to the injured party, show the state official's conduct violated a federal statutory or constitutional right. Saucier, 533 U.S. 194, 201 (2001). The court must also consider whether the constitutional right was clearly established at the time of the violation such that a reasonable official in their position would not have believed their conduct was lawful. Id. at 199. "[The] salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The first prong is discussed in detail in Arguments 2-4 above. The medical records, deposition testimony, and expert affidavits are sufficient to create a genuine issue of material fact as to whether Williams and the CCDC Employees violated Johnson's Fourteenth Amendment due process right by showing deliberate indifference to his serious medical need.

Qualified immunity's second prong considers whether Williams's and the CCDC Employees' misconduct violated clearly established law. Williams and the CCDC Employees argue they had no notice their errors constituted a due process

violation because no Fourth Circuit case previously addressed their precise conduct. (JA95-96). Yet, they fail to acknowledge the key cases providing Williams and the CCDC Employees the required "fair notice." Specifically, these cases support Ms. Johnson's position that ignoring Johnson's serious medical need, interfering with his prescribed care, and delaying his access to emergency medical assistance all violated his due process rights.

The "clearly established" standard is designed to prevent liability for officers who make bad guesses in gray areas. Marciarello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Qualified immunity assures a state actor of nothing more than "fair notice" of a constitutional right "sufficiently clear that a reasonable official would understand what he is doing violates the right." Sims v. Labowitz, 885 F.3d 254, 262 (4th Cir. 2018) (quoting Anderson, 483 U.S. at 640); Hope, 536 U.S. at 739. One way to show the violated right was clearly established and the offending officer was on notice is to identify case law with similar facts.

Significantly, Williams and the CCDC Employees are "not entitled to invoke qualified immunity simply because no other court decisions directly have addressed circumstances like those presented here." Sims, 885 F.3d at 264; Hope, 536 U.S. at 739. In fact, this Court has held that

> although [courts] must avoid ambushing governmental officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not—and should not—assume that governmental officials are incapable of drawing logical inferences, reasoning by analogy, or

> exercising common sense. In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two.

Williams v. Strickland, 917 F.3d 763, 770 (4th Cir. 2019). This holding is not new law but a summation of long-standing precedent refusing to artificially limit the "clearly established" analysis.

Qualified immunity was never intended to "relieve government officials from the responsibility of applying familiar legal principles to new situations." Wilson v. Kittoe, 337 F.3d 392, 402 (4th Cir. 2003). Accordingly, the clearly established standard must go beyond a search for a case with identical facts. The court must consider both "specifically adjudicated rights," and "those manifestly included within more general applications of the core constitutional principles invoked." Booker v. S.C. Dep't of Corrections, 855 F.3d 533, 538 (4th Cir. 2017). And, while clearly established law is generally determined by looking to Supreme Court and Fourth Circuit precedent, when the issue has not been addressed locally, a consensus among the other circuits may be sufficient. Booker, 855 F.3d at 538 (quoting Owens ex rel. Owens v. Lott, 372 F.3d 267, 280 (4th Cir. 2004)). Finally, the Supreme Court continues to recognize some constitutional violations are so overtly illegal no case law is necessary to put the officer on notice. Taylor, 141 S. Ct. at 54 (referring to the "obvious" case).

Here, there was substantial Fourth Circuit precedent available in September 2018 demonstrating clearly established law on the due process right of pretrial detainees with serious ailments. In fact, the district court correctly stated that an incarcerated person's "right to adequate medical care and freedom from deliberate indifference to one's medical needs has been clearly established law in this circuit for decades." (R&R at 21) (citing Scinto, 841 F.3d 219, 236). There is actually very little daylight between this case and the substantive issue considered in Scinto. In both instances, the dispute centers on whether medical providers and correctional officers exhibited deliberate indifference in managing an inmate's diabetes.

Scinto rejected Williams's and the CCDC Employees' argument that cases are not sufficiently similar to the facts here to create clearly established law. In Scinto, a federal inmate asserted Bivens[7] claims against a federal prison physician alleging the physician was deliberately indifferent to the inmate's need for daily insulin to control diabetes and, on a different occasion, his urgent need for care while in the midst of a medical emergency. 841 F.3d at 227-28, 231. The physician argued he was entitled to immunity because no previous court specifically held that failure to provide insulin was a due process violation. Id. at 235-36. This Court rejected that argument, noting "clearly established" law does not require that the very action in

---

[7] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

question was previously deemed unconstitutional. Id. at 236 (quoting Hope, 536 U.S. at 739).

Instead, when it comes to medical treatment of pretrial detainees, the Fourth Circuit "define[s] the right in question as the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." Scinto, 841 F.3d at 236. That is also how the Court has defined the right in previous Eighth Amendment medical care cases. Id. (quoting Iko, 535 F.3d at 242 n. 12 (finding the right in question was "the right to adequate medical care"). The Supreme Court has also defined the right at issue here at that same level of specificity. Scinto, 841 F.3d at 236 (citing Farmer, 511 U.S. at 832). Scinto continues to serve as an express warning to state officials regarding deliberately indifferent medical care even when the need ignored varies from the one Scinto specifically addressed. Tarashuk v. Givens, 53 4th 154, 164 (4th Cir. 2022) (refusing medical provider's request for court to desert Scinto and finding it clearly established a mentally disturbed man' s right to receive a constitutionally adequate mental health assessment following a traffic stop arrest).

In short, the district court erred in awarding Williams and the CCDC Employees qualified immunity because the record shows they violated rights guaranteed by the Fourteenth Amendment's Due Process Clause. The right to

minimally adequate management of an inmate's diabetes was clearly established in July 2019 by <u>Scinto</u> as well as earlier Supreme Court and Fourth Circuit precedent.

## CONCLUSION

Based on the arguments above, Ms. Johnson respectfully requests this Court reverse the district court's summary judgment order. The district court misapplied the law in concluding Johnson's condition only became serious in the moments before he was rushed to the hospital and misinterpreted the record when concluding there was insufficient evidence Williams's and the CCDC Employees' errors rose to the level of deliberate indifference. Johnson was entitled to constitutionally adequate care for his chronic health conditions while detained at CCDC, but what he got instead was Williams's and the CCDC Employees' interference, delays, and indifference. As a result, his manageable diabetes descended to a serious complication and led to an avoidable death. Johnson's week as a CCDC detainee amounted to a series of substantive due process violations, and Ms. Johnson should be permitted to present evidence of those violations to a jury.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Ms. Johnson requests oral argument in this matter. Due to the parties' sharp disagreements on the applicable facts and law, Ms. Johnson believes oral argument will benefit the Court in clarifying the disputed issues.

Respectfully submitted,

/s/ Jordan C. Calloway
Jordan C. Calloway
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800
jcalloway@mcgowanhood.com

Whitney B. Harrison
McGowan, Hood, Felder & Phillips, LLC
1517 Hampton Street
Columbia, SC 29201
(803) 779-0100
wharrison@mcgowanhood.com

*Attorneys for Appellant*

January 3, 2025
Rock Hill, SC

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 24-7009    **Caption:** B. Johnson v. T. Adams et al.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ___12,393___ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 [*identify word processing program*] in
Times New Roman 14 pt. [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) /s/ Jordan C. Calloway

Party Name Jordan C. Calloway                    Date: January 3, 2025